IN RE ESTATE OF JEFFREY B., DECEASED.
JAMES RIGGINS AND TERESA RIGGINS, APPELLEES, V. GEORGE H. SHANER AND CATHERINE SHANER, APPELLANTS.
688 N.W.2d 135

Filed October 29, 2004.   No. S-03-1404.

Stephanie R. Hupp, of McHenry, Haszard, Hansen, Roth & Hupp, P.C., for appellants.

Terrance A. Poppe and Kelly N. Tollefsen, of Morrow, Poppe, Otte, Watermeier & Phillips, P.C., for appellees.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## NATURE OF CASE

This case involves the guardianship of V.B. and S.B., whose parents died in separate drug-related incidents. In his will, Jeffrey B. (Jeff), the father, appointed George H. Shaner and Catherine Shaner as testamentary guardians, and after Jeff's death, the Shaners accepted that appointment. James Riggins and Teresa Riggins, the children's successor guardians under Jeff's will, filed a motion to remove the Shaners and have themselves appointed as guardians, and the county court granted those requests. The question presented in this appeal is what presumption, if any, must be overcome to remove a minor's testamentary guardian.

## FACTUAL BACKGROUND

At the time of the hearing, V.B. was 9 years old and S.B. was 7 years old. George was employed as a computer programmer at the time of the hearing. Catherine was a financial manager at the University of Nebraska. James was the day custodian in charge of Lincoln High School. Teresa was a staff assistant in the football program at the University of Nebraska. Jamie B., V.B. and S.B.'s mother, had died on December 26, 1999, of an asthma attack that was apparently induced by drug use. James was Jamie's father, and Teresa was Jamie's stepmother.

### CIRCUMSTANCES OF JEFF'S DEATH

Jeff died in a Lincoln, Nebraska, motel room on February 26, 2001, sometime between 1 and 6:10 a.m. Jeff's cause of death was determined to be acute drug overdose by heroin. Richard Doetker, a criminal investigator for the Lincoln Police Department, testified regarding his investigation into Jeff's death. Doetker testified that in his opinion, based on his training and experience, Jeff's body

had either been cleaned off or moved from where he had died. Doetker found it suspicious that although Jeff died of a drug overdose, no drugs or drug paraphernalia were found in the room.

George went to Jeff's motel at approximately 8 a.m. on February 26, 2001. Doetker testified that George had shown up at the motel after calling the front desk "a couple times" and that George had claimed to be Jeff's brother. When asked how and when he found out about Jeff's death, George refused to answer on the ground that he might incriminate himself.

George refused, also on Fifth Amendment grounds, to testify whether he had made any telephone calls from Jeff's motel on the date of Jeff's death. George similarly refused to answer questions about a series of telephone calls placed to his telephone during the early morning hours of February 26, 2001, by Jennifer Mertlik, Jeff's fiance, who is now known as Jennifer Martin (Martin). Doetker testified that telephone records showed a series of calls from Martin's cellular telephone to George's telephone. George refused to answer questions about meeting with Martin, about discussing with her a story to tell the police, or about whether he went to the motel room to clean up a possible crime scene.

George was arrested, but not charged, for witness tampering with respect to Martin. When asked whether he had cooperated fully with the Lincoln Police Department's investigation of Jeff's death, George again invoked his Fifth Amendment rights. Doetker stated that George was facing "possible charges in this investigation," but could not discuss the matter further because it was a continuing investigation.

George had driven to the motel on February 26, 2001, in Jeff's vehicle, which George drove from Jeff's house after going there to get the keys. George refused to say why he went to the house to get the vehicle, who was at the house at the time, what time he arrived there, how he got there, who called him, or where he had been previously. George invoked his Fifth Amendment rights when asked whether he was aware of a drug transaction in Jeff's motel room on February 26. George admitted that he had used marijuana with Jeff about 2 years before Jeff's death. However, George testified that he had not used illegal drugs since then; George stated that he had been regularly tested for illegal drugs prior to the hearing and that the test results were negative.

Catherine also refused, on the ground of spousal privilege, to answer questions about how she had learned of Jeff's death. She similarly refused to say whether she had spoken with anyone at Jeff's motel. She refused to say whether she had known Jeff to use illegal drugs. Catherine also initially invoked spousal privilege when asked about where George had been on the night of Jeff's death or whether George had received any telephone calls on the night of Jeff's death. However, Catherine later testified that she had not gone to the motel room, that George had left their residence at around 2 a.m. on February 26, 2001, and had returned about 6:30 a.m., and that George had received a telephone call before leaving. However, Catherine still refused, on the ground of spousal privilege, to confirm that the telephone call had been from Martin. Catherine also refused to state whether she had heard George tell Martin to lie about the circumstances of Jeff's death.

Martin refused, on Fifth Amendment grounds, to explain how she learned of Jeff's death or if she had spoken with George in the early morning on February 26, 2001, to discuss Jeff's death. Martin also refused to state whether she had either met with George that morning before going to Jeff's motel or discussed with George what they would tell the police. Martin refused to state whether George told her to lie to police. Martin was charged with providing false information to a police officer, but the charge was dismissed following a diversion program.

### SHANERS' GUARDIANSHIP

Jeff's will appointed the Shaners as the guardians of V.B. and S.B., and the Rigginses as successor guardians. On March 8, 2001, the Shaners accepted the testamentary appointment as guardians for V.B. and S.B., and their acceptance was filed with the county court on March 30.

For the first 6 months of the guardianship, V.B. and S.B. stayed with Martin in the house where they had lived with Martin and Jeff. After about 6 months, the children began staying more with the Shaners, but still spent three to four nights a week with Martin. George testified that the Shaners paid Martin $1,000 per month to "babysit"; the money came from V.B.'s and S.B.'s Social Security benefits. However, Martin testified that she was

paid $500 per month. The Shaners also allowed Martin to live rent free with her own children in Jeff's former house, which had been inherited by V.B. and S.B. The Shaners paid Martin's utilities, bought food for the residence, and also helped Martin pay attorney fees. Martin testified that she was provided with the use of a vehicle by the Shaners and that George paid the insurance and fuel expenses for the vehicle.

George had been the personal representative of Jeff's estate, but on May 13, 2002, George resigned as personal representative and First Nebraska Trust Company (First Nebraska) was appointed as successor personal representative. A trust officer for First Nebraska confirmed that Jeff's residence, which belonged to the children as an asset of Jeff's estate, had been lived in rent free and that estate assets were being used to pay the utilities for that residence. The trust officer was also asked about the property that she was managing for the children. She was reluctant to talk about the family trust because of privacy concerns, but the trust officer stated that most of the assets—approximately $243,000—were still in the estate.

Catherine testified that she and George owned a Quonset hut in Lincoln and that they had owned it since "'95, '96." The hut had an upstairs and downstairs. The upstairs had been "off limits to children" from the time it was built until about a year before the hearing. Catherine testified that V.B. and S.B. had visited the Quonset hut with Jeff and that the Shaners, Martin, and a "[f]ew other friends" were often present. Catherine testified that the upstairs was an "adult room," where they "did cigarette smoking and play[ed] Dominoes and had a few beers." Martin also testified that the upstairs was an "adult room," but she refused to explain why, on the ground that it might incriminate her. Martin invoked her Fifth Amendment rights when asked whether George brought drugs to the Quonset, whether George used drugs there, or whether V.B. and S.B. had been present at the Quonset when drugs were used.

### RIGGINSES' GUARDIANSHIP

On May 1, 2002, the Rigginses filed an application in the county court for an order appointing them as temporary coguardians and coconservators of V.B. and S.B. The parties then

stipulated, on June 18, that the Rigginses should be appointed "successor temporary co-guardians and co-conservators" of the children until trial could be had on their motion to remove the Shaners as guardians. The stipulation provided the Shaners with "parenting time" on every other weekend, every Wednesday, and alternate Mondays. The county court entered an order to that effect.

A school social worker for Lincoln Public Schools worked with V.B. and S.B. starting in September 2002. The social worker testified generally that V.B. and S.B. were doing well since they had been living with the Rigginses and had made positive gains since moving. The social worker testified that she would be concerned if the children returned to the Shaners, because "on a couple of different occasions," the children had "mentioned that they're afraid of the Shaners." The social worker did not have any concerns about the Rigginses.

V.B. testified over objection. V.B. stated that she did not like going to visit the Shaners because she did not "think they [were] good people." However, V.B.'s testimony indicated that her opinion was based, at least in part, on things that the Rigginses had told her about the Shaners. James admitted that he had negative opinions about the Shaners and that when the children asked for his opinions, he answered those questions truthfully.

Dr. Lisa Blankenau, a licensed psychologist, also testified over objection. The Shaners objected on the basis that Blankenau had been disclosed as a witness only 2 days before she was called to testify. Specifically, they objected that

> [w]e have not had any opportunity to obtain a rebuttal expert witness. What I would ask is either that this witness be stricken or that in that alternative if the Court is going to allow this witness to testify that when the Shaner's [sic] case is presented that we may have the opportunity to withhold our rest to obtain a rebuttal witness.

The Shaners also filed a motion in limine, stating that they "need[ed] adequate time to obtain rebuttal expert." The court ruled that it would hear the testimony but that the Shaners could withhold their rest "for a reasonable period of time to offer any evidence you wish in — in response thereto." However, the Shaners rested without presenting a witness to rebut Blankenau's

testimony, despite being reminded by the court at the time that they had been granted leave to withhold their rest.

Blankenau testified about her evaluation of V.B. and S.B. Blankenau testified that V.B. had consistently stated that she did not want to go with the Shaners, because she was afraid of them, they were unpredictable, she was confused by them, and they intimidated her and S.B. Blankenau opined that continued visitation with the Shaners was not in V.B.'s or S.B.'s best interests. Blankenau also testified that she did not believe that V.B. and S.B. were being manipulated or coached, because V.B. always provided examples of things that happened when she was with the Shaners that made her feel the way that she did. Blankenau did not make any recommendation regarding the fitness of the Shaners to be guardians.

The Rigginses testified generally regarding their activities with the children, their relationship with the children, and the children's relationship with their half brother, who is also in the Rigginses' care. Similarly, the Shaners testified about their activities with the children and presented testimony from other witnesses regarding the Shaners' relationship with the children and their fitness to be parents.

## COUNTY COURT FINDINGS

At the conclusion of trial, on October 23, 2003, the county court temporarily ordered a halt to the Shaners' visitation, pending a permanent resolution of the case. No objection to that order appears in the record.

On November 24, 2003, the county court entered an order appointing the Rigginses as coguardians of V.B. and S.B. The court stated that "the ultimate standard for the appointment of a guardian is what is in the best interests of the minor children." The court found that "[i]t is without question to this Court that it is in the best interests of [V.B. and S.B.] that James Riggins and Teresa Riggins be appointed their guardians. The evidence is overwhelming . . . ." The court specifically noted the testimony of Blankenau and the school social worker that the children were doing well in the Rigginses' care. The court also stated that

> [t]he refusal by George . . . to answer any questions with
> respect to his knowledge of the events leading up to and

subsequent to the death of [Jeff] is very troubling to this Court. Where a defendant in a civil case refuses to testify on the grounds that the evidence may incriminate him a Court may draw an adverse inference from his refusal to do so. . . . The questions raised regarding [Jeff's] death, the evidence presented regarding that death, and [George's] refusal to testify regarding that leave this Court no choice but to reach very disturbing conclusions therewith[.]

(Citation omitted.) The court stated similar concerns regarding Catherine's refusal to answer certain questions. The court found that the children were doing well academically and socially and had a close relationship with the Rigginses and that removing V.B. and S.B. from the Rigginses' care would do irreparable harm to the children. The court found that the Shaners were unfit to serve as guardians for the children and that it was not in the best interests of the children for the Shaners to be granted any parenting time with the children. The court ordered the parties to pay their own attorney fees. The Shaners perfected this appeal.

## ASSIGNMENTS OF ERROR

The Shaners assign, consolidated and restated, that the county court erred in (1) appointing the Rigginses as guardians of the children, without giving due weight to the nomination of the Shaners as guardians in Jeff's will; (2) applying a "broad evidentiary standard" to the proceedings, including allowing hearsay evidence; (3) allowing evidence regarding the deaths of Jeff and Jamie; (4) allowing Blankenau's testimony; (5) entering a temporary order at the conclusion of the trial to terminate the Shaners' visitation; (6) terminating the Shaners' visitation; (7) failing to award attorney fees to the Shaners; and (8) overruling the Shaners' motion for directed verdict.

## STANDARD OF REVIEW

Appeals of matters arising under the Nebraska Probate Code, Neb. Rev. Stat. §§ 30-2201 through 30-2902 (Reissue 1995 & Cum. Supp. 2002), are reviewed for error on the record. *In re Guardianship of D.J., ante* p. 239, 682 N.W.2d 238 (2004). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported

by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

In proceedings where the Nebraska rules of evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor involved in assessing admissibility. *Woollen v. State,* 256 Neb. 865, 593 N.W.2d 729 (1999). Because the exercise of judicial discretion is implicit in determinations of relevancy and admissibility under Neb. Rev. Stat. § 27-401 (Reissue 1995), the trial court's decision will not be reversed absent an abuse of discretion. *V.C. v. Casady,* 262 Neb. 714, 634 N.W.2d 798 (2001).

## ANALYSIS

### STANDARD FOR REMOVING TESTAMENTARY GUARDIAN

The first issue we must address is the burden of proof applicable to a proceeding to remove a guardian who has accepted a testamentary appointment. The Rigginses contend, and the county court determined, that the best interests of the children are controlling. The Shaners argue, however, that a testamentary guardian is entitled to a presumption of fitness and may be removed only if clear and convincing evidence shows the guardian to be unfit.

Our resolution of this issue is controlled by the relevant provisions of the Nebraska Probate Code. The parent of a minor may appoint, by will, a guardian of an unmarried minor. § 30-2606. Section 30-2605 provides that "[a] person becomes a guardian of a minor by acceptance of a testamentary appointment or upon appointment by the court. The guardianship status continues until terminated, without regard to the location from time to time of the guardian and minor ward." Subject to the objection of a minor over the age of 14, a testamentary appointment becomes effective upon filing the guardian's acceptance in the court in which the will is probated. § 30-2606. A court may appoint a guardian for a minor if all parental rights of custody have been terminated or suspended by circumstances or court order, but a guardian appointed by will has priority over a guardian who may be appointed by the court. § 30-2608(d).

The priority provision of § 30-2608(d) is intended to address circumstances in which a court-appointed guardian comes into

existence before a parental nomination is discovered or implemented by acceptance, so that the authority of the court-appointed guardian will be terminated in favor of the parental nomination. See Unif. Probate Code § 5-204, comment, 8 U.L.A. 98 (Supp. 2004). However, while a guardian appointed by will has priority over a guardian who may be appointed by a court, the statutes draw no distinction between those methods of appointment once a guardian has, in fact, been appointed. In other words, the means by which a guardian has been appointed ceases to be relevant once the appointment is complete.

Section 30-2616 provides in part as follows:

(a) Any person interested in the welfare of a ward, or the ward, if fourteen or more years of age, may petition for removal of a guardian on the ground that removal would be in the best interest of the ward. A guardian may petition for permission to resign. A petition for removal or for permission to resign may, but need not, include a request for appointment of a successor guardian.

(b) After notice and hearing on a petition for removal or for permission to resign, the court may terminate the guardianship and make any further order that may be appropriate.

Section 30-2616 does not distinguish between guardians appointed by will or by the court, and we find no other basis in the statutes for such a distinction. While a guardian appointed by will has priority in the process of *appointment*, once appointed, a testamentary guardian is simply a guardian like any other, with the same legal status as a guardian appointed by the court. See Unif. Probate Code § 5-201, comment, 8 U.L.A. 332 (1998). Consequently, whether appointed by will or by the court, the standard for removal of the guardian of a minor pursuant to § 30-2616 is the same: "the best interest of the ward."

In arguing to the contrary, the Shaners cite *Clymer v. La Velle*, 194 Neb. 91, 230 N.W.2d 213 (1975), in which the guardianship of an orphan, Todd Allen La Velle, was contested between Todd's aunt and uncle and Todd's sister. Todd's father left a will that contained a testamentary appointment of Todd's aunt and uncle as his guardians. The Shaners rely, in this case, upon our statement in that opinion that "[t]he testamentary appointment of [Todd's aunt and uncle] as Todd's guardians cannot be ignored.

Todd's father was obviously concerned for his welfare and was in the best position to act in Todd's best interests. He knew intimately both the [aunt and uncle] and [Todd's sister]." *Id.* at 93, 230 N.W.2d at 216.

The Shaners' reliance on *La Velle* is unavailing for two reasons. First, our decision in *La Velle* was based upon law that preceded Nebraska's adoption of the Uniform Probate Code. Thus, the instant case is controlled by statutory provisions that were not in effect when *La Velle* was litigated. Second, the Shaners fail to note our conclusion in *La Velle* that "[i]t is generally held that [a testamentary appointment of a guardian] will be upheld *unless the best interests of the child require otherwise.*" (Emphasis supplied.) 194 Neb. at 93, 230 N.W.2d at 216. As explained above, this standard is consistent with that imposed by current Nebraska law.

The Shaners also argue that a testamentary guardian is entitled to the same presumptions given a natural or adoptive parent in proceedings for termination of parental rights, or over more distant relatives or nonrelatives in guardianship proceedings. This contention is meritless. We recently discussed the principle of parental preference, in the context of a guardianship proceeding, in *In re Guardianship of D.J., ante* p. 239, 682 N.W.2d 238 (2004). We stated that the principle of parental preference provides that a court may not properly deprive a biological or adoptive parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship or has forfeited that right. *Id.*

However, we explained that the primary justification for the parental preference principle is based upon constitutional considerations. Parents and their children have a recognized unique and legal interest in, and a constitutionally protected right to, companionship and care as a consequence of the parent-child relationship—a relationship that in the absence of parental unfitness or a compelling state interest, is entitled to protection from intrusion. *Id.,* citing *Uhing v. Uhing,* 241 Neb. 368, 488 N.W.2d 366 (1992). We also noted that in addition to those constitutional considerations, in custody disputes between a parent and nonparent, courts turn to the parental preference principle because the best interests standard, taken to its logical conclusion, would place the

minor children of all but the "worthiest" members of society in jeopardy of a custody challenge. *Id.* We concluded that

> unless it has been affirmatively shown that a biological or adoptive parent is unfit or has forfeited his or her right to custody, the U.S. Constitution and sound public policy protect a parent's right to custody of his or her child. While the best interests of the child remain the lodestar of child custody disputes, a parent's superior right to custody must be given its due regard, and absent its negation, a parent retains the right to custody over his or her child.

*In re Guardianship of D.J., ante* at 247-48, 682 N.W.2d at 245.

However, the concerns we articulated in *In re Guardianship of D.J.* are limited to disputes in which a natural parent's right to custody is directly implicated. Where a parent's constitutionally protected relationship with a child is not at issue, both public policy and the Nebraska statutes require the case to be determined by reference to the "paramount concern" in child custody disputes—the best interests of the child. See *id.* at 243, 682 N.W.2d at 243.

### APPOINTMENT OF RIGGINSES AS GUARDIANS

Having concluded that the county court acted correctly in applying the standard of the best interests of the children, without affording the Shaners a presumption based upon Jeff's testamentary appointment, resolution of the Shaners' first and most important assignment of error requires us to determine if the court erred in finding that the best interests of the children were served by appointing the Rigginses as guardians. Specifically, we must determine if the court's decision is supported by competent evidence.

In this regard, we note, as did the county court, that where a defendant in a civil case refuses to testify on the ground that the evidence may incriminate him or her, the trier of fact may draw an adverse inference from the refusal. See *Wilson v. Misko*, 244 Neb. 526, 508 N.W.2d 238 (1993). See, also, *Baxter v. Palmigiano*, 425 U.S. 308, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976). Given the record before us, we conclude that the county court's decision is supported by competent evidence. The record contains substantial evidence showing that the children are thriving in the Rigginses' care,

and this evidence alone would suffice to support the county court's decision. But the record also contains, as the court stated, evidence which raises unsettling questions about the Shaners' fitness to serve as guardians for the children, and this evidence also supports the county court's decision.

Considering the evidence set forth above, the appropriate legal principles, and our standard of review, we conclude that the record contains competent evidence supporting the county court's determination that the best interests of V.B. and S.B. were served by appointing the Rigginses to serve as guardians for the children. The Shaners' first assignment of error is without merit.

## EVIDENTIARY ISSUES

The Shaners' next three assignments of error concern evidentiary rulings made by the county court. First, the Shaners argue that the county court erred by applying a "broad evidentiary standard" to the proceedings, including the admission of hearsay. The Shaners claim that "[i]t is clear from reviewing the entire record in this case that hearsay evidence abounded." Brief for appellants at 28. However, in support of this argument, the Shaners identify only two instances in the record that they contend were hearsay. Consequently, we will consider the Shaners' objections in only those two instances. In order that assignments of error concerning the admission or rejection of evidence may be considered, an appellate court requires that appropriate references be made to the specific evidence against which an objection is urged. *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989). It is not the function of an appellate court to scour the record looking for unidentified evidentiary errors. See *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002).

The first identified instance of hearsay is contained in the following colloquy, from the direct examination of the school social worker:

[Rigginses' counsel:] Does [V.B.] appear to you to be happy?

[School social worker:] She appears to me to be torn.

Q Okay. And what do you mean by that?

A Well, I think given the situation and the custody issues that are going on, I think she feels like there are a lot of

feelings that she can't express. I think she's got a lot of fears. I think she likes living with her grandparents. I know she does. She tells me that so —

[Shaners' counsel]: Objection. Hearsay.

THE COURT: Well, the rules are broad in this kind of a suit. Overruled. I'll receive the answer.

Q Does [V.B.] appear to you to be healthy?

A Healthy, yes.

Plainly, the Shaners were not prejudiced by the overruling of their objection. To constitute reversible error in a civil case, the wrongful admission of evidence must unfairly prejudice a substantial right of a litigant complaining about evidence admitted. *Blue Valley Co-op v. National Farmers Org.*, 257 Neb. 751, 600 N.W.2d 786 (1999). Here, while the Shaners' objection was overruled, the social worker never finished the statement to which the Shaners were objecting. Consequently, the testimony to which the objection was directed is not in evidence, despite the unfavorable ruling from the court.

The other instance identified by the Shaners occurred during the direct examination of Doetker, who was discussing his investigation into Jeff's death upon Doetker's arrival at the motel.

[Rigginses' counsel:] What did you do after arriving there?

[Doetker:] Basically I was briefed on what occurred there. The receptionist had told me that —

[Shaners' counsel]: Objection. Hearsay.

THE COURT: Well, I'm gonna overrule the objection. Rules of Evidence are very broad in this kind of a case. It's overruled. You may answer.

[Doetker:] The investigation showed that [an individual] checked into Room Number 203 approximately 3 p.m. on February 25th, 2001. And that a gentleman by the name of Jeff [B.] then came to that hotel at approximately 10 p.m. that evening.

This colloquy again fails to demonstrate any prejudice to the Shaners. The only potentially prejudicial information contained in Doetker's statement was that Jeff arrived at the motel—a fact which was established continuously throughout the record. Evidence objected to which is substantially similar to evidence

admitted without objection results in no prejudicial error. *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999). Because neither of the hearsay objections identified by the Shaners resulted in prejudice to them, we reject their second assignment of error.

Next, the Shaners assign that the county court erred in admitting evidence regarding the deaths of Jeff and Jamie, which evidence the Shaners argue was irrelevant. However, the record contains very little evidence regarding Jamie's death and reveals nothing that would be prejudicial to the Shaners. The Shaners' argument on appeal is based on the evidence of Jeff's death and George's possible involvement in Jeff's death and its aftermath.

We simply reject the Shaners' argument that evidence of Jeff's death was irrelevant to the issues to be decided in these proceedings. The county court inferred "very disturbing conclusions" from George's repeated reliance on the Fifth Amendment. Those inferences were within the court's discretion and reflected on George's fitness to serve as guardian. It is difficult to conclude that evidence directly bearing on a guardian's general obedience to the law, and specific involvement in the death of his wards' father, is not relevant to his fitness to continue in the role of guardian. It was certainly not an abuse of discretion for the county court to conclude that such evidence was relevant. The Shaners' third assignment of error is without merit.

Finally, the Shaners argue that the county court erred in allowing Blankenau to testify because she was belatedly disclosed as a witness. Generally, the control of discovery is a matter for judicial discretion. *Gallner v. Hoffman*, 264 Neb. 995, 653 N.W.2d 838 (2002). Here, the court exercised its discretion by granting the Shaners' request to withhold their rest until they could obtain rebuttal testimony. This was, as reflected above, specifically requested by the Shaners in their objection and motion in limine.

A party cannot complain of error which that party has invited the court to commit. *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002). In this case, the Shaners asked the court to exclude Blankenau's testimony or, in the alternative, allow them time to obtain a rebuttal witness. The court chose the latter, but the Shaners did not present a witness to rebut Blankenau's

testimony. In short, the court gave the Shaners what they requested in their objection and motion, and the Shaners cannot complain about that ruling on appeal.

## VISITATION

The Shaners' fifth and sixth assignments of error are directed at the county court's termination of the Shaners' visitation. Their fifth assignment of error, however, is moot. A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive. *State on behalf of Pathammavong v. Pathammavong, ante* p. 1, 679 N.W.2d 749 (2004). The Shaners complain that the temporary termination of their visitation at the conclusion of trial was ordered without notice to the parties and violated their right to due process. However, the issue of whether the temporary order was issued in error was relevant only from the time that it was ordered until it was replaced by the county court's permanent order. Therefore, any issue relating to the temporary order is moot and need not be addressed in order to resolve this appeal. See *id.*

The Shaners also argue that the court erred in permanently terminating their visitation. However, we conclude that the court's order is supported by competent evidence. The best interests of the children are the primary and paramount considerations in determining and modifying visitation rights. *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001). The Shaners are not related to V.B. and S.B. and have no legal right to visitation. Cf. *Pier v. Bolles*, 257 Neb. 120, 596 N.W.2d 1 (1999). The record suggests that the children did not like visiting with the Shaners and were fearful of them, and that the instability associated with visitation was negatively affecting them. The need for a stable home environment free of unsettling influences is one of the factors to be considered in determining reasonable visitation rights. *Fine, supra.* The record also demonstrates hostility between the parties and disagreements over visitation prior to trial which required the court's intervention to resolve. Given these facts, we cannot say that the county court erred in concluding that the best interests of the children would not be served by continuing the Shaners' visitation schedule with the children.

### REMAINING ASSIGNMENTS OF ERROR

We have considered the Shaners' two remaining assignments of error regarding the court's overruling of their motion for directed verdict and the potential award of attorney fees, and find each assignment of error to be without merit.

### CONCLUSION

The county court correctly concluded that in proceedings to remove a testamentary guardian of a minor, the appropriate standard is the best interests of the minor. The court's finding that the best interests of V.B. and S.B. were served by appointing the Rigginses to serve as guardians is supported by competent evidence, and the court did not commit reversible error in its evidentiary rulings or in terminating the Shaners' visitation. The county court's judgment is affirmed.

AFFIRMED.

HENDRY, C.J., not participating.