In re Trust Created by LaVerne D. Nabity and
Evelyn A. Nabity, Grantors.
Robert D. Nabity and Mark L. Nabity, appellees,
v. Elizabeth A. Rubek, appellant.

In re Guardianship and Conservatorship
of Evelyn A. Nabity.
Robert D. Nabity, appellee, v.
Mary C. Rose, appellant.

___ N.W.2d ___

Filed September 26, 2014.    Nos. S-13-670, S-13-671.

1. **Trusts: Equity: Appeal and Error.** Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record.

2. **Guardians and Conservators: Appeal and Error.** An appellate court reviews guardianship and conservatorship proceedings for error appearing on the record made in the county court.

3. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

4. ____: ____. In instances when an appellate court is required to review cases for error appearing on the record, questions of law are nonetheless reviewed de novo on the record.

5. ____: ____. An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the trial court when competent evidence supports those findings.

6. **Mental Competency: Proof.** To set aside an instrument for lack of mental capacity on the part of the person executing such instrument, there must be clear and convincing evidence that the mind of the person executing the instrument was so weak or unbalanced when the instrument was executed that the person could not understand or comprehend the purport and effect of what he or she was doing.

7. **Moot Question: Words and Phrases.** A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive.

8. **Moot Question: Appeal and Error.** Under the public interest exception, an appellate court may review an otherwise moot case if it involves a matter affecting the public interest or when other rights or liabilities may be affected by its determination.

9. **Appeal and Error.** Errors argued but not assigned will not be considered on appeal.

Appeals from the County Court for Douglas County: Darryl R. Lowe, Judge. Affirmed.

Lawrence K. Sheehan, of Ellick, Jones, Buelt, Blazek & Longo, L.L.P., and, on brief, Nick Halbur, of Thompson Law Office, P.C., L.L.O., for appellants.

Lisa M. Line, of Brodkey, Peebles, Belmont & Line, L.L.P., for appellees.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Wright, J.

## I. NATURE OF CASE

These consolidated appeals arise from proceedings involving the appointment of a guardian and conservator for Evelyn A. Nabity and the administration of a trust established for her care. In the appeal from the trust administration proceeding, the issue presented is whether Evelyn was competent to execute amendments to the trust agreement which changed the identity of the trustees. We find that there was clear and convincing evidence that Evelyn was incompetent to execute those amendments, and we affirm the order setting them aside. In the other appeal, we consider whether the appointment of a permanent guardian and conservator for Evelyn denied her the benefit of a valid health care power of attorney. We conclude that it did not, and we affirm the order setting aside the 1998 health care power of attorney and appointing a permanent guardian and conservator for Evelyn.

## II. SCOPE OF REVIEW

[1] Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record. *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014).

[2,3] An appellate court reviews guardianship and conservatorship proceedings for error appearing on the record made in the county court. *In re Conservatorship of Gibilisco*, 277 Neb. 465, 763 N.W.2d 71 (2009). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by

competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*.

[4,5] In instances when an appellate court is required to review cases for error appearing on the record, questions of law are nonetheless reviewed de novo on the record. *In re Trust Created by Hansen*, 274 Neb. 199, 739 N.W.2d 170 (2007). An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the trial court when competent evidence supports those findings. *In re Estate of Dueck*, 274 Neb. 89, 736 N.W.2d 720 (2007).

## III. FACTS

Evelyn is a resident of Omaha, Nebraska. She has 11 living children: Elizabeth A. Rubek (Elizabeth); Robert D. Nabity; Gerald P. Nabity; Mark L. Nabity; Dwayne J. Nabity; Katherine M. Wells; Patricia J. Krehoff, now known as Patricia J. Brock (Patricia); Philip J. Nabity; Cynthia A. Ray (Cynthia); Sandra M. Burrows; and Mary C. Nabity, now known as Mary C. Rose (Mary). Evelyn's husband, LaVerne D. Nabity, passed away in 2004.

### 1. Creation of Trust

In September 1998, LaVerne and Evelyn formed the LaVerne D. Nabity and Evelyn A. Nabity Trust. LaVerne and Evelyn were designated as trustees. The trust agreement provided that if one of them became unable or unwilling to serve as trustee, "the remaining Trustee shall temporarily serve as the Trustee. Until a successor Trustee is appointed, the remaining Trustee may take any action or exercise any power granted to the Trustee . . . ." The surviving original trustee had the power to appoint a successor trustee to act as cotrustee.

The trust agreement provided that Robert and Mark were to serve as successor cotrustees. They were to become trustees "when there is no acting trustee or when the trustee is unable or unwilling to act." There is no indication that Evelyn appointed Robert and Mark to serve as her cotrustees after LaVerne died.

## 2. 1998 Health Care
### Power of Attorney

In September 1998, in addition to forming the trust, Evelyn executed a health care power of attorney. The document named LaVerne as Evelyn's attorney in fact for health care and Elizabeth and Mary as successor attorneys in fact for health care. It did not nominate anyone to serve as guardian in the event that one was later appointed.

## 3. 2011 Neuropsychological Evaluation
### and Powers of Attorney

In 1999, Evelyn was diagnosed with "mild memory impairment." By late 2010 and early 2011, her children started noticing a decline in her mental and physical condition.

On September 30, 2011, Dr. Nadia Pare, a clinical neuropsychologist, performed an examination of Evelyn to determine her "medical and financial capacity." During the examination, Evelyn did not know the date or the day of the week, was "repetitious in conversation," "show[ed] slowness in thinking," and had "difficulty with more complex tasks" meant to show "concrete thinking processes." The examination revealed that Evelyn suffered from impairments to multiple mental processes, including "working memory" and "executive functioning (including poor reasoning and problem solving, insight, concrete thinking, and impulsivity)."

On October 3, 2011, Pare diagnosed Evelyn with "dementia of probable Alzheimer's disease etiology" with a "moderate level of severity." Pare opined that Evelyn did not have the capacity to "make complex medical decisions" or decide whether she should remain in her home. Pare also noted that Evelyn was "unable to define the concept of power of attorney" and "confus[ed] this concept with a lawyer or a trust, despite being re-explained the question." Pare recommended that Evelyn's family pursue a conservatorship and a health care power of attorney.

In response to Pare's recommendations, Patricia downloaded a durable general power of attorney from the Internet and took Evelyn to execute it before a notary. This power of attorney,

signed on October 3, 2011, named Patricia and Elizabeth as joint agents.

On October 10, 2011, Evelyn executed yet another durable general power of attorney and a health care power of attorney. Both documents were prepared by her attorney and executed before a notary. The durable general power of attorney named Patricia and Elizabeth as Evelyn's attorneys in fact and gave them "full power to act or to omit to act regarding [her] estate or [her] person." The document specifically granted the power to name a guardian or conservator for Evelyn, but it did not require the attorneys in fact to nominate any particular individual. The health care power of attorney named Elizabeth and Mary as Evelyn's attorneys in fact for health care. The document did not nominate anyone to serve as guardian in the event that one was later appointed.

## 4. Amendment of Trust

Evelyn also executed amendments to the original trust agreement on October 10, 2011. The amendments identified Evelyn, Patricia, and Elizabeth as cotrustees and removed the provision designating Robert and Mark as successor trustees. The amendments were signed by Evelyn as "grantor" and by Evelyn, Patricia, and Elizabeth, allegedly as cotrustees. Since the trust agreement was amended, Patricia and Elizabeth have not taken over the duties of cotrustees.

## 5. 2012 Health Care Power of Attorney

On January 20, 2012, Evelyn executed a third health care power of attorney. The document named Mary as Evelyn's attorney in fact for health care and Elizabeth as an alternate agent. It differed from the prior powers of attorney in that it nominated the attorney in fact for health care to serve as Evelyn's guardian in the event a guardian was later appointed.

At the time Evelyn executed this health care power of attorney, her attorney believed Evelyn was competent to do so, because Evelyn "understood what she was signing and was willing to do so." Evelyn's attorney knew that Evelyn experienced "some confusion" but was not aware that Evelyn had

been diagnosed with dementia or Alzheimer's disease. After the document was executed, Evelyn's attorney learned about the October 2011 neuropsychological evaluation.

## 6. Family Dispute

In the following months, a family dispute developed over Evelyn's care. Some of Evelyn's children, including Robert, did not feel that Mary was keeping the other children informed of their mother's condition. Evelyn's attorney attempted to facilitate communication between the children, to no avail, and on June 6, 2012, she recommended that the children engage in mediation, which did not occur.

In early June 2012, Mary took Evelyn to stay with her in Illinois. Evelyn believed she was going there for a 2-week vacation, and Mary represented to Evelyn's other children that Evelyn was going to Illinois for a vacation. However, Evelyn stayed with Mary for several months.

Subsequently and without Mary's knowledge, Cynthia brought Evelyn from Illinois to Nebraska. Evelyn stayed with Patricia until Evelyn was admitted to a hospital on November 8, 2012. On November 20, Evelyn was discharged from the hospital to "House of Hope," where she continues to reside.

## 7. Guardianship, Conservatorship, and Trust Administration Proceedings

Shortly before Evelyn returned to Nebraska, Robert petitioned for the appointment of a guardian, conservator, and guardian ad litem for her and for registration and administration of the trust. The resulting guardianship and conservatorship proceeding was designated "No. PR12-1422" in Douglas County Court. The trust administration proceeding was designated "No. PR12-1425" in Douglas County Court.

Robert filed for registration and administration of the trust in his capacity as "Nominated Successor Trustee/Interested Party." He alleged that there was need for "instruction and oversight by the [county] court" due to LaVerne's death and Evelyn's "inability . . . to independently handle her own affairs." Robert argued that in October 2011, Evelyn had not been competent to amend the trust agreement, and he requested a determination

whether Robert and Mark (as identified in the original trust agreement) or Evelyn, Patricia, and Elizabeth (as identified in the amendments) were the proper trustees. Elizabeth and Mary objected to Robert's petition. They asserted that Evelyn was competent to execute the trust amendments and that as a result, Evelyn, Patricia, and Elizabeth were the trustees.

In the petition for appointment of a guardian and conservator, Robert alleged that Evelyn was "unable to make responsible decisions as to (1) determining appropriate residential assistance . . . ; (2) protecting personal effects and financial assets; (3) responsibly arranging for and following her medical care[;] and (4) receiving and applying [her] money and property . . . for her benefit." He asserted that Evelyn had executed several powers of attorney within the previous year, all of which were executed "after she was determined unable to handle her own affairs." The county court determined that an emergency existed, appointed Robert to serve as temporary guardian and conservator, and appointed a guardian ad litem.

Mary objected to the guardianship and conservatorship proceeding and moved to intervene. She claimed that she should be recognized as Evelyn's chosen attorney in fact for health care under the 1998 health care power of attorney. She requested a hearing on the necessity of the temporary guardianship and conservatorship, for which she claimed there was no justification in light of the 1998 health care power of attorney.

As temporary guardian and conservator, Robert moved for a determination of the validity of the 1998 health care power of attorney. He argued that the 1998 health care power of attorney should be revoked pursuant to Neb. Rev. Stat. § 30-3421 (Reissue 2008), because even if it was effective, the attorneys in fact had failed to "act in a manner consistent with the wishes of the principal or in the best interests of the principal."

At a hearing, Robert adduced evidence that called into question Mary's ability to care for Evelyn in the manner recommended by Evelyn's doctors. He demonstrated that as temporary guardian and conservator, he had followed the advice of Evelyn's doctors and guardian ad litem. He also adduced

evidence relevant to Evelyn's competency to execute the various documents at issue. Mary adduced evidence that Evelyn expressed a desire for Mary to make health care decisions for her and that Evelyn was happy and cared for while she stayed with Mary in Illinois. The evidence received at the hearing was considered in both the guardianship and conservatorship proceeding and the trust administration proceeding.

On February 19, 2013, at Robert's request, the county court extended the temporary guardianship and conservatorship for an additional 90 days. The court also received additional evidence. Relevant to the guardianship and conservatorship proceeding was the testimony of Evelyn's guardian ad litem that a guardianship for Evelyn was necessary and that Evelyn had not been properly cared for prior to the temporary guardianship. The guardian ad litem recommended Robert to serve as permanent guardian. She opined that Robert had the "emotional wherewithal to be able to take a step back for the good of his mother and the good of the rest of his siblings." Relevant to the trust administration proceeding was Robert's evidence (1) that on the day Evelyn amended the trust agreement, she was "confused"; (2) that after being appointed cotrustees by the trust amendments, Patricia and Elizabeth never took control of the trust assets; and (3) that Patricia and Elizabeth would not be able to work together as cotrustees.

On May 6, 2013, Robert moved for an "order finalizing the guardianship/conservatorship or in the alternative finding good cause to continue the temporary guardianship." Elizabeth and Mary objected to the motion. They asked the county court to deny Robert's request to continue the temporary guardianship and conservatorship or, in the alternative, to appoint Elizabeth and Mary to serve as conservator and guardian, respectively. Over Elizabeth and Mary's objection, the court extended the temporary guardianship and conservatorship for an additional 90 days.

## 8. County Court Orders

On July 3, 2013, the county court entered an order in the guardianship and conservatorship proceeding. It found that Evelyn was not competent to execute the 2011 and 2012

powers of attorney but that the attempts to execute those powers of attorney nonetheless revoked the 1998 health care power of attorney. It determined that in any event, the agents for health care identified in the various powers of attorney had failed to act in Evelyn's best interests. In regard to Mary in particular, the court concluded that

> by neglecting her obligations under a power of attorney and continuing to allow Evelyn [to] make her own decisions when Evelyn does not have insight or judgment into taking care of herself, [Mary] has disqualified herself from serving as an agent for Evelyn either under a power of attorney or as a guardian.

In light of these factual findings and pursuant to § 30-3421(1)(d), the court set aside the 1998 health care power of attorney. It ordered the temporary guardianship and conservatorship to become permanent, with Robert continuing to serve as guardian and conservator.

On July 11, 2013, the county court entered an order in the trust administration proceeding declaring Robert and Mark cotrustees. It cited to and incorporated the court's finding in the guardianship and conservatorship proceeding that Evelyn was "not competent to execute estate planning documents, including powers of attorney and trust amendments[,] in October, 2011."

On August 2, 2013, the county court overruled Elizabeth's motion to waive a supersedeas bond and set the supersedeas bond at $25,000. The record does not reflect that Elizabeth posted the supersedeas bond.

### 9. Appellate Proceedings

Elizabeth and Mary separately appealed. Elizabeth's appeal, case No. S-13-670, is brought within the context of the trust administration proceeding. Mary's appeal, case No. S-13-671, arises within the guardianship and conservatorship proceeding. Their appeals have been consolidated.

Pursuant to our statutory authority to regulate the dockets of the appellate courts of this state, we moved the consolidated cases to our docket. See Neb. Rev. Stat. § 24-1106(3)

(Reissue 2008). Robert and Mark filed a motion to dismiss Elizabeth's appeal due to lack of standing and failure to post bond, which motion we overruled without prejudice.

## IV. ASSIGNMENTS OF ERROR

A single brief was submitted by Elizabeth and Mary. As is relevant to case No. S-13-670, Elizabeth assigns that the county court erred in finding that Evelyn lacked capacity to amend the trust agreement in October 2011, in removing Patricia and Elizabeth as cotrustees, and in appointing Robert and Mark as cotrustees. In case No. S-13-671, Mary assigns, restated, that the county court erred in failing to find that Evelyn was being deprived of the benefit of an agent appointed under a valid power of attorney and in finding that Elizabeth and Mary should be removed as Evelyn's attorneys in fact for failing to act in Evelyn's best interests.

## V. ANALYSIS

### 1. Appeal in Trust Administration
Proceeding

[6] Robert's petition for trust administration requested a determination whether Robert and Mark (as identified in the original trust agreement) or Evelyn, Patricia, and Elizabeth (as identified in the October 2011 amendments) were the proper trustees. The county court found by clear and convincing evidence that Evelyn was not competent to execute the trust amendments and thus declared Robert and Mark to be trustees. Although the court did not explicitly state that it set aside the trust amendments due to Evelyn's lack of competence, it was implicit in the order, given that the court subsequently named Robert and Mark as successor trustees, in accordance with the original, unamended trust agreement. To set aside an instrument for "lack of mental capacity on the part of the person executing such instrument," there must be clear and convincing evidence that "the mind of the person executing the instrument was so weak or unbalanced when the instrument was executed that the person could not understand or comprehend the purport and effect of what he or she was doing."

See *Cotton v. Ostroski*, 250 Neb. 911, 918, 554 N.W.2d 130, 135 (1996).

Elizabeth argues that the evidence of incompetence was not sufficient for the county court to set aside the amendments. But we do not agree. There was clear and convincing evidence that supported the court's determination.

The evidence showed that on the day Evelyn executed the trust amendments, she suffered from a weak and unbalanced mind. Those who witnessed her execute the trust amendments testified that she was "confused" and did not know what day of the week it was. Due to Evelyn's confusion, someone had to "point out where she needed to sign." At the time of executing the trust amendments, Evelyn was under a recent diagnosis of "[m]oderate dementia . . . secondary to Alzheimer['s] disease" and suffered impairments in "executive functioning (including poor reasoning and problem solving, insight, concrete thinking, and impulsivity)." The evidence was that from the date of that diagnosis forward, there would be only a decline in Evelyn's condition.

There was also clear and convincing evidence that Evelyn did not understand the effect of what she was doing by executing the trust amendments. Elizabeth testified that Evelyn believed the purpose of the document was to take Robert's name "off of there." But there was no evidence that Evelyn understood what the implications of that removal would be. Only a few days earlier, Evelyn had been unable to distinguish between the concepts of a trust, a lawyer, and a financial power of attorney. This evidence satisfied the legal burden for setting aside the trust amendments. See *id*.

The county court did not err in setting aside the trust amendments. And once the trust amendments were set aside by reason of Evelyn's incompetence, there was no question as to the identity of the trustees. The original trust agreement clearly provided that Robert and Mark were cotrustees. We find no error on the record in the court's order naming Robert and Mark as cotrustees. Therefore, we affirm the order in the trust administration proceeding.

## 2. Appeal in Guardianship and Conservatorship Proceeding

The issues before the county court in the guardianship and conservatorship proceeding were (1) whether any of the various powers of attorney executed by Evelyn were valid and (2) whether there should be a permanent guardianship and conservatorship. The court determined that Evelyn was not competent to execute the 2011 and 2012 powers of attorney and that the 1998 health care power of attorney had been revoked. In concluding that the 1998 health care power of attorney was revoked, the court determined that the agents named in that document had disqualified themselves from serving in that capacity by taking actions contrary to the best interests of Evelyn. Finally, the court determined that there should be a permanent guardian and conservator and appointed Robert to serve as such. Mary challenges all of these determinations.

### (a) Mootness

Before we can address the merits of Mary's appeal, we must first discuss the mootness of her claims as to the temporary guardianship and conservatorship. Mary alleges that the county court erred by failing to recognize the 1998 health care power of attorney as valid. She argues that the court committed this error at various points throughout the guardianship and conservatorship proceeding, including when the court (1) appointed a temporary guardian and conservator instead of relying upon the agents named in the 1998 health care power of attorney and (2) allowed Robert to seek an emergency temporary guardianship and conservatorship without requiring him to first obtain a hearing on the effectiveness of the 1998 health care power of attorney. Robert and Mark argue that because these issues relate to the appointment of a temporary guardian and conservator, they were "rendered moot upon the entrance of the permanent order" of guardianship and conservatorship. See brief for appellees at 29. We agree.

[7] A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the

issues presented are no longer alive. *In re Estate of Jeffrey B.*, 268 Neb. 761, 688 N.W.2d 135 (2004). In the case of a temporary order later replaced by a permanent order, the question whether it was "issued in error was relevant only from the time that it was ordered until it was replaced by the . . . permanent order." *Id*. at 777, 688 N.W.2d at 147. In an appeal from the permanent order, "any issue relating to the temporary order is moot and need not be addressed." *Id*.

In the instant case, any arguments raised by Mary in relation to the granting and extension of the temporary guardianship and conservatorship became moot upon entry of the permanent guardianship and conservatorship. The orders granting and extending the temporary guardianship and conservatorship were temporary in nature. By statute, they were effective for only 90 days each. See Neb. Rev. Stat. § 30-2626(d) (Cum. Supp. 2012). Upon entry of the July 3, 2013, order, the temporary guardianship and conservatorship, along with the orders establishing and extending them, were replaced by the permanent guardianship and conservatorship. At that time, any issues relating to the granting and extension of the temporary guardianship and conservatorship became moot.

[8] Mary argues that even if we determine that the issues relating to the temporary guardianship and conservatorship are moot, we should consider them under the public interest exception to the mootness doctrine. "'[U]nder the public interest exception, we may review an otherwise moot case if it involves a matter affecting the public interest or when other rights or liabilities may be affected by its determination.'" *In re Interest of Thomas M.*, 282 Neb. 316, 321, 803 N.W.2d 46, 51 (2011).

Mary alleges that the errors in the temporary guardianship and conservatorship affect the public interest, because such temporary proceedings "will continue to be employed" to circumvent the protections of health care powers of attorney unless we clarify that the protections of a health care power of attorney "must be exhausted before resorting to Guardianship proceedings." See reply brief for appellants at 9-10. Mary urges us to consider the propriety of temporary guardianship and conservatorship proceedings so that we can

prevent other individuals from being deprived of the protections of valid health care powers of attorney through the use of such proceedings.

But as we explain below, the temporary guardianship and conservatorship proceeding in the instant case did not deprive Evelyn of the protections of a valid health care power of attorney. Consequently, this case does not present us with an opportunity to discuss the alleged dangers identified by Mary and does not concern a matter of public interest.

However, not all of Mary's arguments relate solely to the temporary guardianship and conservatorship. Those that relate to the permanent appointment of a guardian and conservator are not moot.

### (b) Validity of Power of Attorney

Mary alleges that the county court erred in failing to find that Evelyn was being deprived of the benefit of a valid power of attorney. She argues that the 1998 health care power of attorney remained valid and that the agents named therein should not have been disqualified. She does not allege that the court erred in determining that Evelyn was not competent to execute the 2011 and 2012 powers of attorney. Therefore, we address only the validity of the 1998 health care power of attorney.

The county court concluded that the 1998 health care power of attorney was invalid for two reasons: (1) It was revoked by the execution of the 2011 and 2012 powers of attorney, and (2) it should be set aside due to the actions of the attorneys in fact named therein, pursuant to § 30-3421(1)(d). We can reverse the judgment of the county court only if these determinations did not conform to the law, were not supported by competent evidence, or were arbitrary, capricious, or unreasonable. See *In re Conservatorship of Gibilisco*, 277 Neb. 465, 763 N.W.2d 71 (2009).

### (i) Revocation by Subsequent Documents

The county court concluded that even though Evelyn was not competent to execute the 2011 and 2012 health care powers of attorney, those documents revoked the 1998 health care

power of attorney. We find this to be not in conformity with the law.

Neb. Rev. Stat. § 30-3420(4) (Reissue 2008) provides that the "execution of a valid power of attorney for health care shall revoke any previously executed power of attorney for health care." But the 2011 and 2012 health care powers of attorney were not valid. The county court found by clear and convincing evidence that Evelyn was not competent to execute those documents, and this finding has not been challenged. Because the 2011 and 2012 powers of attorney were not valid due to Evelyn's incompetence, her signing of those documents did not effectively revoke the 1998 health care power of attorney. The county court erred in concluding to the contrary.

### (ii) Revocation by Actions of Attorneys in Fact for Health Care

The county court also concluded that the 1998 health care power of attorney should be set aside pursuant to § 30-3421(1)(d). A court can revoke a power of attorney for health care

> upon a determination by the court of both of the following: (i) That the attorney in fact has violated, failed to perform, or is unable to perform the duty to act in a manner consistent with the wishes of the principal or, when the desires of the principal are unknown, to act in a manner that is in the best interests of the principal; and (ii) that at the time of the determination by the court, the principal lacks the capacity to revoke the power of attorney for health care.

§ 30-3421(1)(d). The court determined that Elizabeth and Mary, the attorneys in fact under the 1998 health care power of attorney, had failed to act in Evelyn's best interests, because they had failed to provide the "necessary health care support" for Evelyn or arrange for the "necessary health care provisions identified" in the neuropsychological examination. The court also determined that Evelyn was not competent to revoke the 1998 health care power of attorney. Accordingly, the court concluded that the requirements for revocation under

§ 30-3421(1)(d) were satisfied and set aside the 1998 health care power of attorney.

Mary argues that in determining whether she and Elizabeth failed to perform their duties under the 1998 health care power of attorney, the county court applied a standard that was contrary to § 30-3421(1)(d). She alleges that because Evelyn's wishes regarding health care were known, her best interests were not a factor. We do not agree that the court erred in considering best interests.

In order for a court to revoke a health care power of attorney pursuant to § 30-3421(1)(d), the attorney in fact for health care must have violated or failed to perform his or her duty in that capacity. Depending on the circumstances, the duty of an attorney in fact for health care is defined according to either the wishes of the person on whose behalf the attorney in fact is acting or the person's best interests. Neb. Rev. Stat. § 30-3418(1) (Reissue 2008) provides that

> an attorney in fact shall have a duty . . . to make health care decisions (a) in accordance with the principal's wishes as expressed in the power of attorney for health care or as otherwise made known to the attorney in fact or (b) if the principal's wishes are not reasonably known and cannot with reasonable diligence be ascertained, in accordance with the principal's best interests, with due regard for the principal's religious and moral beliefs if known.

Section 30-3421(1)(d) reflects this same difference in duty depending on whether the principal's wishes are known, requiring a determination that the attorney in fact violated the duty either "to act in a manner consistent with the wishes of the principal" or "to act in a manner that is in the best interests of the principal." This latter determination is required "when the desires of the principal are unknown." See *id*.

Evelyn's primary wish regarding health care—that she remain in her home—was known. Evelyn's attorney and Mary testified that on more than one occasion, Evelyn indicated her desire to remain in her home. Evelyn's doctor also testified that Evelyn said she wanted to stay in her home.

But beyond Evelyn's general desire to remain in her home, the record does not reflect that she expressed specific wishes as to her medical care at any time when she was competent. Mary testified that in October 2011, Evelyn expressed her desire to live with Mary if she ever needed to live with someone. However, in October, Evelyn was not competent to execute legal documents and did not have the mental capacity to decide whether she could live at home or make complex medical decisions. Evelyn's statement that she wished to live with Mary was expressed at a time when Evelyn was not competent to make such a decision.

Mary's testimony includes several references to Evelyn's wish not to be placed in a nursing home or assisted living facility or have in-home care. But we cannot ascertain from Mary's testimony when Evelyn expressed these desires. In the absence of such evidence, we cannot conclude that Evelyn expressed her desires while competent.

The only desire Evelyn expressed while competent was her general desire to live alone in her home. Otherwise, her wishes as to medical care were not known. In particular, it was unknown what Evelyn would have desired if and when it became impossible for her to remain in her home. There is no evidence that she expressed her wishes on this matter at any time when she was competent.

In October 2011, Elizabeth and Mary were advised by Evelyn's doctor that it was impossible for Evelyn to remain in her home and that they "needed to start looking . . . for more care." From that time forward, the wishes that Evelyn had expressed while competent (staying in her home) were impossible to fulfill and Elizabeth and Mary faced medical decisions about which Evelyn's wishes were not known and could not be reasonably ascertained due to Evelyn's incompetence (how she wished to be cared for once it became impossible for her to remain in her home).

Because after October 2011, Evelyn's wishes about care outside of the home were not known, Elizabeth and Mary's duty was to act in a manner consistent with Evelyn's "best

interests." See § 30-3418(1). They were no longer required to defer to the limited "wishes" Evelyn had expressed while competent. The county court did not err in applying a best interests analysis to Elizabeth's and Mary's actions under the 1998 health care power of attorney.

The county court determined that Elizabeth and Mary had failed to act in Evelyn's best interests:

> They failed to acknowledge the severity of Evelyn's condition, refused to obtain or provide assistance in Evelyn's home or in an alternate placement near Evelyn's home. They have failed to take Evelyn to scheduled appointments, failed to act on the advice of Evelyn's counsel or medical providers, substituted their own medical knowledge in lieu of health care professionals working with Evelyn and allowed Evelyn in her diminished mental capacity to make her own decisions in regard to her care.

This determination is amply supported by the evidence. In October 2011, one of Evelyn's doctors, Pare, informed Elizabeth and Mary that Evelyn should not live alone at home. Pare advised them that failure to provide the necessary care and support for Evelyn would be considered "elder neglect." Yet, from October 2011 to June 2012, Elizabeth and Mary allowed Evelyn to reside alone in her home. Mary testified that they never looked into alternative options for Evelyn, such as in-home health care, assisted living, day centers, or inpatient skilled placement. Such behavior was consistent with other evidence that Mary either did not understand or refused to recognize the full extent of Evelyn's mental impairment. Finally, we note that while Evelyn was in Illinois, Mary did not take Evelyn to scheduled medical appointments and may not have ensured that Evelyn took her prescription medications. Based on this evidence, we agree with the county court's determination that Elizabeth and Mary failed to act in Evelyn's best interests. The county court did not err in setting aside the 1998 health care power of attorney under § 30-3421(1)(d).

### (c) Permanent Guardianship and
### Conservatorship

We next decide whether the county court erred in establishing a permanent guardianship and conservatorship for Evelyn. Mary's principal argument is that the 1998 health care power of attorney should have superseded the guardianship and conservatorship and made them unnecessary. In fact, this is the only ground upon which she challenges the entry of the permanent conservatorship. However, given our determination that the 1998 health care power of attorney was properly set aside, there is not a valid health care power of attorney at issue. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Holdsworth v. Greenwood Farmers Co-op*, 286 Neb. 49, 835 N.W.2d 30 (2013). Accordingly, we do not address the interplay between health care powers of attorney and guardianship and conservatorship proceedings.

We find no error in the county court's entry of a permanent guardianship and conservatorship for Evelyn. A court can appoint a permanent guardian "if it is satisfied by clear and convincing evidence that the person for whom a guardian is sought is incapacitated and that the appointment is necessary or desirable as the least restrictive alternative available for providing continuing care or supervision of the person . . . alleged to be incapacitated." Neb. Rev. Stat. § 30-2620(a) (Cum. Supp. 2012).

A court can appoint a permanent conservator

> in relation to the estate and property affairs of a person if the court is satisfied by clear and convincing evidence that (i) the person is unable to manage his or her property and property affairs effectively for reasons such as mental illness, mental deficiency, [or] physical illness or disability . . . and (ii) the person has property which will be wasted or dissipated unless proper management is provided, or that funds are needed for the support, care, and welfare of the person or those entitled to be supported by him or her and that protection is necessary or desirable to obtain or provide funds.

Neb. Rev. Stat. § 30-2630(2) (Reissue 2008).

Competent evidence supports a finding that Evelyn is "incapacitated." See § 30-2620(a). Due to Evelyn's dementia and Alzheimer's disease, she does not recognize her cognitive limitations, has "difficulty in daily living," and cannot make medical or financial decisions. Her condition is not expected to improve.

Given that Evelyn cannot make decisions for herself, there is clear and convincing evidence that a permanent guardianship is necessary and is the "least restrictive alternative available for providing continuing care" for her. See § 30-2620(a). Evelyn's guardian ad litem testified that it was in Evelyn's best interests to receive "24-hour care" and that Evelyn "needs to be under a guardianship." Indeed, there does not appear to be an alternative option.

The aforementioned evidence of Evelyn's incapacity supports a finding that she is "unable to manage" her property due to "mental deficiency." See § 30-2630(2). And because Evelyn requires continual care outside of the home and is unable to manage her affairs, a conservator is necessary for the proper management of her property. See *id.*

The statutory elements for appointing a guardian and conservator have been shown by clear and convincing evidence. We affirm the entry of a permanent guardianship and conservatorship for Evelyn.

### (d) Appointment of Robert

[9] Mary argues, but does not assign, that the county court erred in appointing Robert to serve as guardian and conservator, because "his appointment has not been in Evelyn's best interests." See brief for appellants at 14. Errors argued but not assigned will not be considered on appeal. *Butler County Dairy v. Butler County*, 285 Neb. 408, 827 N.W.2d 267 (2013). Therefore, we do not address whether it was error to choose Robert to serve as guardian and conservator.

### VI. CONCLUSION

For the foregoing reasons, in case No. S-13-670, we affirm the order of the county court setting aside the trust amendments and naming Robert and Mark as cotrustees. In case

No. S-13-671, we affirm the judgment of the county court setting aside the 1998 health care power of attorney, entering a permanent guardianship and conservatorship for Evelyn, and appointing Robert to serve as guardian and conservator.

Affirmed.